## Case No. 4,260.

### ECFORT et al. v. GREELY.

[6 N. B. R. (1873) 433;[1] 4 Chi. Leg. News, 209.]

District Court, W. D. Missouri.

·Luebke & Player and Mr. Judson, for creditors.

Phelps & McAfee, for defendant.

KREKEL, District Judge. This case calls for the determination of two questions:

First. Did Ecfort & Petring have a claim or debt provable under the bankrupt law? and

Second. Did Greely make a transfer, sale, or conveyance of his. property with intent to delay, hinder or defraud his creditors?

·The evidence as to the first question is, that Greely was a partner of a mercantile firm (Brutsche & Greely) which, in the fall of 1867, became embarrassed and asked an extension of time, which was granted by their creditors, of whom Ecfort & Petring were the largest, they having a claim of upwards of thirty-two hundred dollars. In the spring of the year 1868, the firm, finding that they could not meet their liabilities, entered into a composition agreement with their creditors, by which they were to pay fifty cents on the dollar, and which was paid to all except Ecfort & Petring, whom they proposed to pay in full, if they would give a large extension of time. This proposition was accepted by Ecfort & Petring, on condition that they would secure them as far as they were able. This the debtor firm agreed to do, and afterwards assigned two judgments, which amounted, when collected, to thirteen hundred and forty dollars. They also made a conveyance of a lot in Jerome, a station on the present At-

---

[1] [Reprinted from 6 N. B. R. 433, by permission.]

lantic and Pacific Railroad, at its crossing of the Gasconade river, which was estimated at two thousand five hundred dollars. As to the nature of this conveyance a controversy arises, Greely claiming that the assignment of the judgments and conveyance was in full satisfaction of the Ecfort & Petring indebtedness, while it is claimed by the latter firm that the conveyance, though in form absolute, was collateral only. The extension above referred to was granted on the twentieth day of September, 1867, as shown by the notes executed on that day; the compromise with the creditors the spring following, 1868, and the assignment of judgments and deed on the sixteenth day of March, 1869. On the day of the assignment of the judgments and the making of the deed, two papers were signed by Ecfort & Petring and delivered to Greely, who produces them in court, one receipting for the judgments, closing with these words: "And the amounts realized on said judgments to be placed to their credit as soon as received by us;" the other stating that they had received Brutsche & Greely's warranty deed for lots eleven and twelve in block twenty-four in Jerome, with the improvements thereon, valued at two thousand five hundred dollars, and proceeding to say: "And we hereby agree with Messrs. Brutsche & Greely to return them said property within twelve months from date, provided they shall by that time have liquidated their indebtedness," and setting out that the deed was in the name of Kleinschmidt. Construing these papers together, it is difficult to arrive at the conclusion that a final settlement and payment of the indebtedness of Ecfort & Petring was thereby intended. The assignment of the judgment shows, upon its face, that the amount realized therefrom should be credited on the indebtedness. But, aside from this, the amount of the judgments and the estimated value of the Jerome property is far greater than any claim Ecfort & Petring had against Brutsche & Greely, and it is not to be supposed that they would pay more than their debt.

The peculiarity of the language of the receipt for the deed is easily understood when examined in the light of the evidence. Greely was deeply interested in Jerome, and hoped to be able to control the influence of the railroad company to again make it the terminus, for a time, at least, of the railroad then building, and hence his desire to have the right to possess the property he had improved and occupied at one time. The witnesses, except Greely, are unanimous in declaring the Jerome property valueless in 1869, the time it was conveyed. The receipt itself speaks of a then existing indebtedness, and only when that had been paid was it to be effective. If any doubt as to the nature of the conveyance could still exist, a letter of February 1, 1870, addressed by Ecfort & Petring to Greely, and the response thereto, would solve it. Among other matters, Ec-

fort & Petring write: "We also request you to come forward and settle off the old affair, as we are informed that you are amply able to do so," to which a response comes, dated February seventh, saying: "As soon as I can manage to pay the balance due on B. & G.'s debt I will do so, meantime it is secured by the judgment assigned to you, which will be paid. * * * I must beg pardon for not calling on you before this, upon this matter, but will do so shortly and explain to you my situation financially." There never was a claim that a final settlement and payment had been made with Ecfort & Petring set up by Greely until about the time of the suits that E. & P. instituted. The notes were never given up by E. & P., and the attempt by Greely to explain why this was not done is unsatisfactory. Besides all this, the evidence in the cause greatly preponderates in favor of the deed being intended as collateral.

The difficulty which might arise in holding that the possessor of collateral is entitled to sue without having exhausted his security, is removed by the concurring testimony of all the witnesses that the Jerome property is comparatively valueless.

Attention has been called to the course E. & P. saw cause to pursue in first having instituted suit in the circuit court of the county in which Greely resides, and that when Greely appears and puts in a plea of payment the plaintiffs dismiss their suit and make the present application. The causes assigned by the petitioning creditors as acts of bankruptcy on the part of Greely, the disposing of his property with the intent to hinder, delay, or defraud his creditors while the suit in the circuit court was pending, would seem to explain what caused the petitioning creditors to move in the bankrupt court. Be that, however, as it may, their right to do so is beyond dispute.

The first question must be solved in favor of petitioning creditors, as having an existing indebtedness provable in bankruptcy.

The second question—did Greely make a disposition of his property with the intent to delay, hinder, or defraud his creditors?—presents more difficulty; and in order to arrive at a conclusion it becomes necessary to carefully examine the evidence. We find Greely, in 1867, engaged as a merchant, partner of the firm of Brutsche & Greely, doing business on the line of the present Atlantic and Pacific railroad. In the fall of 1867 they became embarrassed, obtained an extension of time, and in the spring of 1868 compromising with their creditors at fifty cents. The same partners continue business for about eighteen months, to September, 1869, when they dissolve, Greely undertaking to settle up the affairs of the partnership. Greely testifies that out of the affairs of said partnership there remained to him about two thousand dollars, but this statement comes in conflict with his partner, who swears he never got more than three hun-.

dred dollars out of the assets of the firm, which he himself collected. The Ecfort & Petring debt remains unsettled. Greely commences business in the fall of 1869, on his own account, insures, is burned out in 1870, and commences anew soon after the fire. He had purchased his homestead in the fall of 1869, and improved it afterwards by expending from three to five thousand dollars, as variously estimated by witnesses. He also builds a store-house on one of his lots, expending about two thousand dollars, in the meantime carrying a stock of from five to ten thousand dollars. He estimates his property at the time these proceedings were instituted in round numbers as worth twenty-one thousand five hundred dollars, consisting of store goods, six thousand dollars; homestead, eight thousand dollars; Jerome property, one thousand dollars; notes and accounts, three thousand dollars; mining stock, one thousand dollars; store, one thousand five hundred dollars (after deducting mortgage of one thousand six hundred dollars); Verona real estate, one thousand dollars, making up the amount. When he is asked how he has accumulated so much property in so short a time, under such adverse circumstances, he accounts for it by large profits, which he claims to have made, without in any way supporting this affirmation. The evidence shows that the three thousand dollars of accounts, and one thousand dollars mining stock are utterly valueless. Add to this a one thousand five hundred dollar homestead, and the assets, as estimated by himself, are reduced to sixteen thousand dollars. Of debts, he recounts from memory, six thousand dollars due to various merchants, add one thousand eight hundred dollars to Ecfort & Petring, and three thousand five hundred dollars obtained of his father-in-law, and mortgaged on homestead four hundred dollars, and we have nearly twelve thousand dollars of liabilities, all due, except the three thousand five hundred dollars obtained from his father-in-law, of which, he says, he does not know whether that is a debt or not, but that he gave a paper acknowledging the receipt of the money. Witnesses estimate the Greely property variously at from twelve to fifteen thousand dollars. All agree, that if the property, situate as it is, had to be sold within say six or nine months, it would not bring over one-half of their estimates. It will thus be seen that by very careful management Greely might be able to pay his debts, provided his own time were given him. But to be solvent, when a merchant, does not mean that he can pay his debts in the manner suggested.

In a late case (Toof v. Martin [13 Wall. (80 U. S.) 40]) the supreme court of the United States, December term, 1871, with precision defines insolvency, when applied to merchants and traders. The court says: "It is sometimes used to denote the insufficiency of the entire property and assets of an individual to pay his debts. This is the general and popular meaning. But it is also used in a more restricted sense, to express the inability of a party to pay his debts as they become due in the ordinary course of business. It is in this latter sense that the term is used when traders and merchants are said to be insolvent, and as applied to them, it is the sense intended by the act of congress." Applying this definition to the case before the court, Greely may well be said to be insolvent, with more than eight thousand dollars of debts due, and unable to pay two comparatively small claims presented to him, at the very time he was making such large and sudden changes in his property. It is true that this question of insolvency is not directly in issue, but the effect it has upon determining what a debtor may do or not do with his property, under such circumstances as are shown, is too obvious to need elucidation. We find Greely merchandising with a stock of goods estimated by him at near six thousand dollars, exchanging the one-half thereof, the shelf goods and broken packages, for small pieces of realty, and two second-hand billiard tables, a transaction plainly shown to be out of his usual and ordinary course of business. He disposes of another part of his goods, drawing an order for the pay thereof in favor of one of his creditors. He turns in and sells his store-house, (which he had before rented for a year,) the purchaser assuming a mortgage of one thousand six hundred dollars, and giving him a note for one thousand five hundred dollars, "payable at any bank in St. Louis," for the balance. When payment of the note is enjoined, under the bankruptcy proceedings, he tells the payee that it is in the hands of an innocent purchaser, and that he will have to pay it. The attempted explanation made by Greely of the conversation, in which he is charged to have said this, leaves at least a very unfavorable impression as to what he meant by it. We find the note, after it becomes due, in his hands, with no design to transfer it to his creditors, as far as known, certainly with no effort on his part to turn it into the channel of paying his debts. When asked whether he was going to continue in business in Marshfield, he emphatically asserts that he is, while he himself testifies that he was preparing to go to Mississippi to engage in railroad enterprises. The question of intent to hinder, delay, or defraud his creditors, must be solved by looking at what Greely said and did, and the effect thereof. That the effect of the disposition which Greely had in part made of his property when he was stopped by the bankruptcy proceedings was to hinder and delay his creditors, this court has not the least doubt. That he must have known this to be the case, may readily be inferred from what he said to Potter, that goods could be more

readily made available to pay debts than real estate. If there were any doubts as to Greely's intention to hinder or delay his creditors generally in the collection of their debts, there can be none as to Ecfort & Petring. From the moment they instituted suit he declared his intention not to pay them, and the reason he assigns for so doing is by no means satisfactory to the court. The plea put forth, that they had received payment by the assignment of the judgments and the Jerome deed, has so little to support it in evidence that it must be rejected as conclusive, or persuasive. The fact that Ecfort & Petring were the largest creditors of Brutsche & Greely, and headed the composition agreement entered into by them with their creditors, and without which they could not have succeeded in obtaining the terms they did, and afterwards trying to secure and now claiming their whole debt, arrested the attention of the court, and had there been anything in the testimony showing bad faith on their part toward the other creditors, the court would not be slow in ordering them not to come here without clean hands. But not the least testimony tending in the direction of bad faith has been given by any one, and hence the transaction must be looked upon as made bona fide. In compromises of this character, it may be well to remark, there should not only be the utmost good faith among the creditors, but it would be well to avoid everything calculated to thrown the shadow of a doubt upon them.

The first question, as to an existing, provable debt, having been answered in favor of petitioning creditors;

The second question—Did Greely make a disposition of his property with intent to hinder and delay his creditors?—being also answered in the affirmative;

Greely is, therefore, declared a bankrupt, and adjudged accordingly.